TINA WOLFSON, SBN 174806
twolfson@ahdootwolfson.com
ROBERT AHDOOT, SBN 172098
rahdoot@ahdootwolfson.com
THEODORE W. MAYA, SBN 223242
tmaya@ahdootwolfson.com
**AHDOOT & WOLFSON, P.C.**
10850 Wilshire Boulevard, Suite 370
Los Angeles, California 90024
Tel: 310-474-9111; Fax: 310-474-8585

Counsel for Plaintiff,
MICHAEL HILL

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### San Francisco Division

| | |
|---|---|
| MICHAEL HILL, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　Plaintiff,<br><br>　　　　　　　v.<br><br>ROBERT'S AMERICAN GOURMET FOOD, LLC, a Delaware Limited Liability Company dba PIRATE BRANDS, and VMG PARTNERS II, LLC, a Delaware Limited Liability Company,<br><br>　　　　　　　　Defendants. | Case No. CV 13-00696 YGR<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED<br><br>1. **Violation of California Unfair Competition Law, California Business & Professions Code § 17200, *et seq*.;**<br>2. **Violation of Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.*;**<br>3. **Breach of Express Warranty;**<br>4. **Violation of California False Advertising Law, California Business & Professions Code § 17500, *et seq*.** |

Plaintiff Michael Hill ("Plaintiff"), by and through his counsel, brings this Class Action Complaint against Robert's American Gourmet Food, LLC, doing business as Pirate Brands, and against VMG Partners II, LLC (collectively, "Defendants") on behalf of himself and all others similarly situated, and allege, upon personal knowledge as to his own actions and his counsel's investigations, and upon information and belief as to all other matters, as follows:

## NATURE OF THE CASE

1.  This is a consumer protection and false advertising class action. Defendants market, advertise, and distribute various snack foods under the Pirate Brands name, which they prominently advertise as "all natural." The snack foods at issue include Original Tings Crunchy Corn Sticks, Pirate's Booty Aged White Cheddar Rice and Corn Puffs, Pirate's Booty Barrrrrbeque Rice and Corn Puffs, Pirate's Booty Chocolate Rice and Corn Puffs, Pirate's Booty New York Pizza Rice and Corn Puffs, Pirate's Booty Sour Cream & Onion Rice and Corn Puffs, Pirate's Booty Veggie Rice and Corn Puffs, Potato Flyers Baked Potato Chips Homestyle Barbeque, Potato Flyers Baked Potato Chips Sour Cream & Onion, Potato Flyers Baked Potato Chips The Original, and Smart Puffs Real Wisconsin Cheddar Baked Cheese Puffs (collectively, the "Products").

2.  These snacks are not natural, for two independent reasons. First, the Products are made with genetically modified crops. A genetically modified ("GM") crop, such as the corn, soy, and rapeseed (canola) from which the Products are derived, is a crop whose genetic material has been altered by humans using genetic engineering techniques. The World Health Organization defines GM organisms (which include crops) as "organisms in which the genetic material (DNA) has been altered in a way that does not occur naturally." GM crops are not natural, but man-made. There are wide-ranging controversies related to GM crops, including health risks from ingesting GM foods and negative environmental effects associated with growing GM crops. The use and labeling of GM foods is the subject of a variety of laws, regulations, and protocols worldwide.

3.  Second, some of the Products' ingredients are so heavily processed that they bear no chemical resemblance to the sources from which they were derived. In addition, the Products are the result of high temperature puffing, baking, or cooking that chemically alters the rice, corn, and potatoes to contain a potentially carcinogenic chemical. Through heavy industrialized processing,

Pirate Brands snack foods have become man-made, rather than natural. Ironically, the GM attributes of the ingredients persist despite this heavy processing because the changes are chemical, and not genetic.

4. Although the Products are not "all natural," Defendants prominently label every package of the Products sold in the United States as "all natural." Defendants do this because consumers perceive all natural foods as better, healthier, and more wholesome. In fact, the market for all natural foods has grown rapidly in recent years, a trend for which Defendants seek to take advantage through false advertising.

5. Plaintiff brings claims against Defendants in his individual capacity and on behalf of a California class of all other similarly situated purchasers of the Products for violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*. ("UCL"), Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*. ("CLRA"), breach of express warranties, and a violation of California's False Advertising Law, Cal. Bus & Prof. Code § 17500, *et seq*. ("FAL"). Plaintiff seeks an order requiring Defendants to, among other things: (1) cease the unlawful marketing; (2) conduct a corrective advertising campaign; and (3) pay damages and restitution to Plaintiff and Class members in the amounts paid to purchase the products at issue.

**JURISDICTION AND VENUE**

6. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because the proposed class has more than 100 members, the class contains at least one member of diverse citizenship from Defendants, and the amount in controversy exceeds $5 million.

7. The Court has personal jurisdiction over Defendants because Defendants conduct substantial business in California, generally, and this District, specifically. Defendants have marketed, promoted, distributed, and sold the Products in California. Defendant VMG Partners II, LLC is headquartered and has its principle place of business in this District.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to this action occurred in this District as Defendants distribute the Products for sale within this District, and Defendant VMG Partners II, LLC's marketing decisions emanated from this District.

9. Intradistrict Assignment: Pursuant to Civil Local Rules 3-2(c) a substantial part of the events or omissions which give rise to the claims occurred in San Francisco County, and it is therefore appropriate to assign this action to the San Francisco Division.

**PARTIES**

10. Plaintiff Michael Hill is a resident of San Francisco, California. Mr. Hill has purchased several Products in San Francisco, California (among other locations) within the past four years in reliance on Defendants' representations that the Products were "All Natural." Specifically, within the past four years, Mr. Hill has purchased several bags of the Pirate's Booty Aged White Cheddar Rice and Corn Puffs and Pirate's Booty Veggie Rice and Corn Puffs at the Rainbow Market and Deli located at 4401 18th Street, San Francisco, California. To the best of his recollection, Mr. Hill paid approximately $2.89 or $2.99 for these Products. Most recently, Mr. Hill purchased Pirate's Booty Aged White Cheddar Rice and Corn Puffs at the Rainbow Market and Deli on or about January, 2013 for approximately $2.89. Prominently on each of the labels appeared the words "All Natural." This representation was material to Mr. Hill's decision to make these purchases. Mr. Hill was willing to pay for the Products because of the representations that they were "all natural" and would not have purchased the Products, would not have paid as much for the Products, or would have purchased alternative products in absence of the representations. As a result of purchasing a product in reliance on advertising that was false, Mr. Hill has suffered injury in fact and lost money as a result of the unfair business practiced alleged here.

11. Defendant Robert's American Gourmet Food, LLC ("Pirate Brands") is a Delaware limited liability company with its principal place of business at 100 Roslyn Avenue, Sea Cliff, New York, 11579. Defendants manufacture and distribute the Products from the Pirate Brands manufacturing plant in Sea Cliff, New York to consumers in California and throughout the United States.

12. Defendant VMG Partners II, LLC ("VMG") is a Delaware LLC with its headquarters and principle place of business at 39 Mesa Street, Suite 201, San Francisco, California, 94129.

13. Plaintiff is informed and believes that at all times Defendants Pirate Brands and VMG were partners, principals, agents, co-conspirators, and/or co-venturers of each other, and that each

acted within the course, scope, and authority of such relationships and that, as a result, Defendants are jointly and severally liable for the acts alleged herein.

## SUBSTANTIVE ALLEGATIONS

### Defendants Deceptively Label The Products As "All Natural"

14. This case concerns eleven types of Pirate Brands snack foods. Throughout the Class Period, Defendants have prominently labeled and otherwise advertised the Products as "all natural" in product packaging, in print advertisements, in television commercials, on the Pirate Brands website, and on social media sites such as Facebook. The "all natural" message is inherently intertwined with the Pirate Brands' definition and recognition.

15. For example, Defendants label every bag of the Products as "ALL NATURAL" to the left below the main product logo and the product description:



16.     The back of such bags also features numerous slogans and representations to induce the purchaser into believing that the Products are all natural, including the following statements:

- "These tasty puffs are baked to perfection with real, all natural ingredients."
- "At Pirate Brands, we have been creating healthier treasures since 1987 with the belief you shoudn't have to 'sacrifice' taste for health… Arrr!."
- "We've created products for the whole family that are all natural, baked AND delicious."

17.     On information and belief, VMG plays a critical role in branding the subject Products, and in promulgation of the false "All Natural" labels. On its website, VMG boasts that it "collaborates closely with entrepreneurs and management teams of branded consumer companies to provide resources and strategic guidance that accelerate growth and raise brand awareness." (http://www.vmgpartners.com (last visited May 24, 2013).)

18.     VMG's website further boasts about the company's critical roll in "RANSACKING RETAIL" on behalf of Pirate's Booty: "Pirate's Booty® engages in destination merchandising to broaden its brand awareness and encourage product trial. Fully-branded, end cap merchandising provides the brand with display opportunities while allowing Pirate's Booty to cultivate its unique persona on-shelf. In addition, destination merchandising represents an optimal approach to create impact for the brand's entire product line-up." (*Id.*)

19.     VMG also boasts, on its website, about its role in emphasizing "Natural, 'Better-for-You' Attributes" on the packaging of its clients' products, much like the "All Natural" claims appearing on the subject Products' packaging. (*Id.*)

20.     On information and belief, VMG invested heavily in Pirate Brands in or around 2008, and VMG features Pirate Brands as one of its "Portfolio Companies" on VMG's website. (*Id.*)

21.     On the Pirate Brands website http//www.piratebrands.com, Defendants make numerous statements and representations to re-enforce the "all natural" part of their brand. For example, in the middle of the homepage, a banner appears with the following message:

> Ahoy There!
> You've discovered the isle of healthy snacking. Abundant with all natural, deliciously baked treasures. We've eliminated trans fats and gluten to keep our ingredients simple and family snacking guilt free. Our only additives are just good fun. So get onboard with Pirate's Booty,

>Smart Puffs, Tings, and Potato Flyers, and join the healthy snacking revolution.

(http://www.piratebrands.com (last visited on February 13, 2013).)

22. In recounting the company's history, and referring to Pirate Brands' alleged founder, Defendants state, among other things:

>The Pirate Brands story began in 1987 in Sea Cliff, NY with our founder, Robert. Robert, a snack industry renegade and father of two, scoured the high-seas for a tasty treasure that would inspire people to live a little healthier and have fun while doing it. That's when Robert discovered the cheesy rice and corn puffs we know today as, Pirate's Booty.
>
>Thanks to Robert and his tasty treasure, no longer do you have to eat "cheese" puffs dusted with neon orange powder with incomprehensible ingredients. When you buy Pirate Brands products, you are getting wholesome goodness without the guilt.
>
>We've created products for the whole family that are all natural, baked AND delicious. We've eliminated fryers and trans fats from all of our products and keep the ingredients simple (no need to Google® search today). Our only additives are just good, wholesome fun.
>
>It's been 20 years and we're still continuing our journey by offering fun, and deliciously baked all-natural snacks. You can find Pirate Brands products including, Pirate's Booty, Smart Puffs Potato Flyers and Original Tings at a supermarket near you or at our online store!
>
>Our consumers, family and friends are very important to us. Your loyalty has been longstanding and we thank you for being part of our journey.

(http://www.piratebrands.com/story/ (last visited on February 13, 2013).)

23. The "Frequently Asked Questions" of the website boasts as follows:

>**What makes Pirate Brands' products unique?**
>
>Pirate Brands' snack food products are delectably crunchy, all-natural, baked, trans fat, gluten free and possess great subtle flavors that will have you craving more!
>
>**What are the quality standards of Pirate Brands' ingredients?**
>
>All-natural
>Gluten free
>Trans fat free
>No preservatives
>No artificial sweeteners
>Kosher
>
>**Is Pirate's Booty popcorn?**
>
>Pirate's Booty is made from corn and rice meal that is extruded and results in a puff of rice and corn. In some industry circles, the puffs are known as hull-less popcorn.

6

Case No. CV 13-00696 YGR: AMENDED CLASS ACTION COMPLAINT

> **Are Pirate Brands' products organic?**
>
> No, our products do not qualify as organic, but all Pirate Brands' products are all-natural. According to the Food and Drug Act, products are deemed "all-natural" if nothing artificial or synthetic including color additives, regardless of source has been included in or added to a food that would normally be expected to be in that food. All of Pirate Brands' products meet and exceed the Food and Drug Act's definition of "all-natural."
>
> **Who conducts Pirate Brands' all-natural certification?**
>
> The natural label claim is certified by Pirate Brands' through ingredient sourcing and how the products fall under the auspice and regulatory mandate of the Food and Drug Act.

(http://www.piratebrands.com/faq/ (last visited on February 13, 2013).)

24. The "all natural" claim is re-enforced and re-iterated throughout television commercials for the Products. For example, one TV ad featuring a "limited edition" SpongeBob SquarePants flavor and Defendants' pirate cartoon characters:

- "An all natural snack to guide you through a journey to find your booty"; and
- "Pirate's Booty: The All Natural Baked Snack."

(http://www.youtube.com/watch?v=V-2hM1C4KkA (last visited February 13, 2013).)

25. Similarly, the Pirate Brands Facebook page states the following message under company information: "Ahoy matey! Drop anchor and discover our all natural treasure, Pirate's Booty!" (https://www.facebook.com/piratesbooty (last visited February 13, 2013).)

26. By consistently labeling the Products as "all natural" within the Class Period, Defendants ensured that all consumers purchasing the Products would be exposed to their "all natural" claim.

### Food Derived From Genetically Modified Organisms Is Not Natural

27. GM crops are not crops occurring in nature, and are not "all natural." They are genetically manipulated from their natural state. Monsanto, one of the largest producers of GM crop seed, defines GM organisms as "Plants or animals that have had their genetic makeup altered to exhibit traits that are not naturally theirs. In general, genes are taken (copied) from one organism that shows a desired trait and transferred into the genetic code of another organism." (http://www.monsanto.com/newsviews/Pages/glossary.aspx#g (last visited May 13, 2013).)

28. This definition is consistent with the World Health Organization, which defines GM

organisms as "organisms in which the genetic material (DNA) has been altered in a way that does not occur naturally. The technology is often called 'modern biotechnology' or 'gene technology', sometimes also 'recombinant DNA technology' or 'genetic engineering'. It allows selected individual genes to be transferred from one organism into another, also between non-related species. Such methods are used to create GM plants – which are then used to grow GM food crops." (World Health Organization, 20 Questions on Genetically Modified (GM) Foods at http://www.who.int/foodsafety/publications/biotech/en/20questions_en.pdf (last visited May 13, 2013).)

29. The Environmental Protection Agency has distinguished between conventional breeding of plants "through natural methods, such as cross-pollination" and genetic engineering. (United States Environmental Protection Agency, Prevention, Pesticides and Toxic Substances, Questions & Answers Biotechnology: Final Plant-Pesticide/Plant Incorporated Protectants (PIPs) Rules (Jul. 19, 2001) at http://www.epa.gov/scipoly/biotech/pubs/qanda.pdf ("Conventional breeding is a method in which genes for pesticidal traits are introduced into a plant through natural methods, such as cross-pollination. . . . Genetically engineered plant-incorporated protectants are created through a process that utilizes several different modem scientific techniques to introduce a specific pesticide-producing gene into a plant's DNA genetic material.") (emphasis of "through natural methods" added; remaining emphasis in original) (last visited May 13, 2013)).

30. Romer Labs, a company that provides diagnostic services to the agricultural industry, including tests to detect and determine the existence of GM crops, defines GM crops as "[a]griculturally important plants [that] are often genetically modified by the insertion of DNA material from outside the organism into the plant's DNA sequence, allowing the plant to express novel traits that normally would not appear in nature, such as herbicide or insect resistance. Seed harvested from GMO plants will also contain these modifications." (http://www.romerlabs.com/en/knowledge/gmo/ (last visited May 13, 2013).)

31. As indicated by the definitions above, which come for a wide array of sources, including industry, government, and health organizations, GM crops are not "all natural," and products made from those crops, including the Products, are not "all natural."

32. Testing by an independent third party has revealed that Defendants' Products are made from GM crops.

33. Defendants' "all natural" representations are false, deceptive, misleading, and unfair to consumers, who are injured in fact by purchasing products that Defendants claim are "all natural" when in fact they are not.

### The Products Are Not Natural Because They Are Highly Processed

34. Independent of the use of GM crops to manufacture the Products, Defendants' "all natural" claims are false because the Products contain ingredients that are synthetic and so heavily processed that they no longer are chemically the same as the raw ingredients. The various processes by which the ingredients are synthesized render the final Products chemically derived and non-natural. While they retain the non-natural genetic attributes of the GM crops from which they are sourced, many of the Products' ingredients no longer bear any natural chemical resemblance to their source crops as a result of the extensive process by which they are refined.

35. The Products contain sunflower oil and corn oil, which are heavily processed cooking oils and are not natural. Many types of oil are extracted through processes that allow the oils to retain the chemical composition occurring in nature. Cold pressed olive oil, for example, is produced through a mechanical process of compressing the oil from olives. Chemicals can also be used in the extraction process to obtain a higher yield of oil. However, chemically, the oil at the end of the process is the same as it was at the beginning of the process. In contrast, the processes used to create the cooking oils used in the Products go well beyond mere extraction techniques, resulting in chemically altered goods. These cooking oils typically undergo several distinct chemical processes: (1) extraction; (2) alkali-neutralization; (3) bleaching/deodorizing; and (4) conditioning:

    a. To extract crude oil from sunflower seeds and corn kernels, the manufacturer first applies a physical press to the seeds or kernels, which typically extracts a fraction of the extractable oil. Sunflower oil extraction also utilizes hydrolysis to remove gums (phospholipids) that are naturally occurring in the seed. As part of the extraction process, the sunflower seeds or corn kernels are then treated with Hexane, a carcinogenic chemical linked to cancer and other major health problems in studies conducted on animals, to extract the remaining crude oil. Residual

Hexane may be present in the final product.

    b.    After it has been extracted from the sunflower seed or corn kernel, the crude oil is neutralized with an alkaline soap solution that separates and removes the free fatty acids ("FFAs"). The soap solution is typically separated from the neutralized oil by centrifugal separation. Potassium Hydroxide, a corrosive acid, is used to facilitate the reaction between the alkaline solution and FFAs. Sunflower oil also undergoes dewax crystallization, which chills the oil to crystallize and remove sunflower wax from the oil.

    c.    After neutralization, the cooking oils are bleached and deodorized with additional cleaning solutions to lighten the oil's color and minimize its odor.

    d.    After being bleached and deodorized, the cooking oils are conditioned by the use of a high-concentration Phosphoric Acid, consumption of which has been linked to lower bone density as well as chronic kidney disease.

    36.    In addition, the Products contain one or more of the following synthetic substances:

    a.    <u>Maltodextrin</u>:  A powder additive often used in processed foods as a filler or thickener. Maltodextrin is highly glycemic, refined, carbohydrate complex derived from partial chemical hydrolysis of corn, rice, or potato starch into a white spray-dried powder.

    b.    <u>Evaporated Cane Syrup</u>: Sometimes also labeled as evaporated cane juice, evaporated cane syrup is produced by pressing sugar cane and then boiling it at high heat, which often destroys the sugar cane's beneficial nutrients. It is then further refined by crystallization through evaporation, rendering the final ingredient a chemical of no nutrient value, similar to white sugar.

    c.    <u>Citric Acid</u>: A chemically-synthesized acid that is commonly used in food as an acidifier and/or emulsifier (to keep fats from separating). The fermentation process used to synthesize citric acid includes extraction with sulfuric acid.

    d.    <u>Dextrose</u>: A commercially produced sugar derived from plant starch (usually corn or potato) to add sweetness to processed food. Commerically, Dextrose is produced by employing chemical enzymes to completely break down, or hydrolyze, corn starch.

    37.    In addition, the Products are puffed or baked at high temperatures: Original Tings are

baked corn sticks, Pirate's Booty are baked rice and corn puffs, Potato Flyers are baked potato chips, and Smart Puffs are baked cheese puffs. Typically, the "puffing" of rice and corn utilizes temperatures up to 520 degrees Fahrenheit. The high puffing and baking temperatures of starchy foods catalyzes a chemical synthesis of Acrylamide, a tasteless genotoxic chemical byproduct that has been linked to cancer in animal studies.

## CLASS ACTION ALLEGATIONS

38. Plaintiff seeks relief in his individual capacity and seeks to represent a class consisting of all others who are similarly situated. Pursuant to Fed. R. Civ. P. 23(a) and (b)(2) and/or (b)(3), Plaintiff seeks certification of a class initially defined as follows:

> All California consumers who from February 15, 2009 until the date notice is disseminated to the Class (the "Class Period"), purchased the following Pirate Brands Products: (1) Original Tings Crunchy Corn Sticks, (2) Pirate's Booty Aged White Cheddar Rice and Corn Puffs, (3) Pirate's Booty Barrrrrbeque Rice and Corn Puffs, (4) Pirate's Booty Chocolate Rice and Corn Puffs, (5) Pirate's Booty New York Pizza Rice and Corn Puffs, (6) Pirate's Booty Sour Cream & Onion Rice and Corn Puffs, (7) Pirate's Booty Veggie Rice and Corn Puffs, (8) Potato Flyers Baked Potato Chips Homestyle Barbeque, (9) Potato Flyers Baked Potato Chips Sour Cream & Onion, (10) Potato Flyers Baked Potato Chips The Original, and (11) Smart Puffs Real Wisconsin Cheddar Baked Cheese Puffs.

39. Excluded from the Class are Defendants and their subsidiaries and affiliates, Defendants' executives, board members, legal counsel, the judges and all other court personnel to whom this case is assigned, their immediate families, and those who purchased the Products for the purpose of resale.

40. <u>Numerosity</u>. Fed. R. Civ. P. 23(a)(1). The Class is so numerous that joinder of all members is unfeasible and not practicable. While the precise number of Class members has not been determined at this time, Plaintiff is informed and believes that many thousands or millions of consumers have purchased the Products.

41. <u>Commonality</u>. Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

    a. Whether Defendants conveyed to the class that the Products were "all natural";

    b. Whether Defendants' claim that the Products are "all natural" is true or false or likely to deceive a reasonable consumer;

    c. Whether Defendants violated California Business and Professions Code § 17200, *et seq.*;

    d. Whether Defendants violated California Civil Code § 1750, *et seq.*;

    e. Whether Defendants breached an express warranty;

    f. Whether Defendants violated California Business and Professions Code § 17500, *et seq.*; and

    g. The nature of the relief, including equitable relief, to which Plaintiff and the Class members are entitled.

42. <u>Typicality</u>. Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the claims of the Class. Plaintiff and all Class members were exposed to uniform practices and sustained injury arising out of and caused by Defendants' unlawful conduct.

43. <u>Adequacy of Representation</u>. Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

44. <u>Superiority of Class Action</u>. Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

45. <u>Injunctive and Declaratory Relief</u>. Fed. R. Civ. P. 23(b)(2). Defendants' misrepresentations are uniform as to all members of the Class. Defendants have acted or refused to act

on grounds that apply generally to the Class, so that final injunctive relief or declaratory relief is appropriate with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

**(Violations of California Unfair Competition Law – Cal. Bus. & Prof. Code § 17200, *et seq*.)**

46.     Plaintiff incorporates by reference and re-alleges the substantive allegations set forth above.

47.     Defendants engaged in unlawful, unfair, and/or fraudulent conduct under California Business & Professional Code § 17200, *et seq.*, by representing that the Products are "All Natural," when they are not.

48.     Defendants' conduct is unlawful in that it violates the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.*, the False Advertising Law, California Business & Professions Code § 17500.

49.     Defendants' conduct is unfair in that it offends established public policy and/or is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to Plaintiff and Class members.  The harm to Plaintiff and Class members arising from Defendants' conduct outweighs any legitimate benefit Defendants derived from the conduct.  Defendants' conduct undermines and violates the stated spirit and policies underlying the Consumers Legal Remedies Act and the False Advertising Law as alleged herein.

50.     Defendants' actions and practices constitute "fraudulent" business practices in violation of the UCL because, among other things, they are likely to deceive reasonable consumers.  Plaintiff relied on Defendants' representations and omissions.

51.     As a direct and proximate result of Defendants' violations, Plaintiff suffered injury in fact and lost money because he purchased and paid the price he paid believing the Products to be all natural when they were not.

52.     Plaintiff, on behalf of himself and Class members, seeks equitable relief in the form of an order requiring Defendants to refund Plaintiff and all Class members all monies they paid for the Products, and injunctive relief in the form of an order prohibiting Defendants from engaging in the alleged misconduct and performing a corrective advertising campaign.

## SECOND CAUSE OF ACTION

**(Violation of Consumer Legal Remedies Act – Civil Code § 1750, *et seq.*)**

53. Plaintiff incorporates by reference and re-alleges the substantive allegations set forth above.

54. Plaintiff brings this claim individually and on behalf of the Class.

55. This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.* (the "CLRA") because Defendants' actions and conduct described herein constitute transactions that have resulted in the sale or lease of goods or services to consumers.

56. Plaintiff and each member of the Class are consumers as defined by California Civil Code §1761(d).

57. The Products are goods within the meaning of Civil Code §1761(a).

58. Defendants violated the CLRA in at least the following respects:

    a.    in violation of §1770(a)(2), Defendants misrepresented the source of the Products as all natural, when they were not;

    b.    in violation of §1770(a)(5), Defendants represented that the Products have approval, characteristics, and uses or benefits which they do not have;

    c.    in violation of §1770(a)(7), Defendants represented that the Products are of a particular standard, quality or grade, or that the Products are of a particular style, or model, when they are of another;

    d.    in violation of §1770(a)(9), Defendants have advertised the Products with intent not to sell them as advertised; and

    e.    in violation of §1770(a)(16), Defendants represented that the Products have been supplied in accordance with previous representations, when they were not.

59. Defendants violated the Act by representing the Products as all natural when the Products were not all natural. Defendants knew, or should have known, that the representations and advertisements were false and misleading.

60. Defendants' acts and omissions constitute unfair, deceptive, and misleading business

practices in violation of Civil Code §1770(a).

61. On February 13, 2013, Plaintiff notified Pirate Brands in writing by certified mail of the violations alleged herein and demanded that Pirate Brands remedy those violations. Defendant Pirate Brands received Plaintiff's notice on February 26, 2013.

62. Defendants have failed to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to §1782 of the California Act. Plaintiff thus amends his Complaint to add claims for actual, punitive, and statutory damages pursuant to the CLRA. Plaintiff and the Class also seek a Court order enjoining the above-described wrongful acts and practices of Defendants and for restitution, disgorgement, statutory damages, and any other relief that the Court deems proper.

63. Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally and knowingly provided misleading information to the public.

## THIRD CAUSE OF ACTION

**(Breach of Express Warranty)**

64. Plaintiff incorporates by reference and re-alleges the substantive allegations set forth above.

65. Plaintiff brings this claim individually and on behalf of the Class.

66. Plaintiff and each member of the Class formed a contract with Defendants at the time Plaintiff and the other members of the Class purchased one or more of the Products. The terms of that contract include the promises and affirmations of fact made by Defendants on the packaging of the Products, as described above. The Products' packaging constitutes express warranties, became part of the basis of the bargain, and are part of a standardized contract between Plaintiff and the members of the Class on the one hand, and Defendants on the other.

67. All conditions precedent to Defendants' liability under this contract have been performed by Plaintiff and the Class.

68. Defendants breached the terms of this contract, including the express warranties, with Plaintiff and the Class by not providing the products that could provide the benefits promised, i.e. that the Products were "all natural."

69. As a result of Defendants' breach of their contract, Plaintiff and the Class have been damaged in the amount of the purchase price of any and all of the Products they purchased.

### FOURTH CAUSE OF ACTION

**(Violation of California False Advertising Law – Cal. Bus. & Prof. Code § 17500, *et seq*.)**

70. Plaintiff incorporates by reference and re-alleges the substantive allegations set forth above.

71. Defendants publicly disseminated untrue or misleading advertising or intended not to sell the Products as advertised in violation of California Business & Professional Code § 17500, *et seq.*, by representing that the Products are "All Natural," when they are not.

72. Defendants committed such violations of the False Advertising Law with actual knowledge or in the exercise of reasonable care should have known was untrue or misleading.

73. Plaintiff reasonably relied on Defendants' representations and/or omissions made in violation of California Business & Professional Code § 17500, *et seq*.

74. As a direct and proximate result of Defendants' violations, Plaintiff suffered injury in fact and lost money because he purchased and paid the price he paid believing the Products to be all natural when they were not.

75. Plaintiff, on behalf of himself and Class members, seeks equitable relief in the form of an order requiring Defendants to refund Plaintiff and all Class members all monies they paid for the Products, and injunctive relief in the form of an order prohibiting Defendants from engaging in the alleged misconduct and performing a corrective advertising campaign.

### JURY DEMAND

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter judgment in his favor and against Defendants, as follows:

A. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative and appointing the undersigned counsel as Class

Counsel;

B. Ordering Defendants to pay actual damages (and no less than the statutory minimum damages) and equitable monetary relief to Plaintiff and the other members of the Class;

C. Ordering Defendants to pay punitive damages, as allowable by law, to Plaintiff and the other members of the Class;

D. Ordering Defendants to pay statutory damages, as allowable by the statutes asserted herein, to Plaintiff and the other members of the Class;

E. Awarding injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, and ordering Defendants to engage in a corrective advertising campaign;

F. Ordering Defendants to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Class;

G. Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded; and

H. Ordering such other and further relief as may be just and proper.

Dated: May 24, 2013

Respectfully submitted,
**AHDOOT & WOLFSON, PC**

Tina Wolfson
Robert Ahdoot
Theodore W. Maya
10850 Wilshire Blvd., Suite 370
Los Angeles, California 90024
Tel: 310-474-9111
Facsimile: 310-474-8585

Counsel for Plaintiff,
Michael Hill

# AFFIDAVIT OF TINA WOLFSON

I, Tina Wolfson, declare as follows:

1. I am an attorney with the law firm of Ahdoot & Wolfson, P.C., counsel for Plaintiff Michael Hill ("Plaintiff") in this action. I am admitted to practice law in California and before this Court, and am a member in good standing of the State Bar of California. This declaration is made pursuant to California Civil Code section 1780(d). I make this declaration based on my research of public records and upon personal knowledge and, if called upon to do so, could and would testify competently thereto.

2. Based on my research and personal knowledge, Defendants Robert's American Gourmet Food, LLC and VMG Partners II, LLC (collectively, "Defendants") do business within the County of San Francisco and Plaintiff purchased Defendants' products within the County of San Francisco, as alleged in the Class Action Complaint.

I declare under penalty of perjury under the laws of the United States and the State of California this 24th day of May, 2013 in Los Angeles, California that the foregoing is true and correct.

_____
Tina Wolfson